**In re Ulpiano UNANUE–CASAL a/k/a Charles Unanue, Debtor.**

GOYA FOODS, INC.; Goya de Puerto Rico, Inc.; Zolmar Realty Corp.; Interamericas Advertising; Island Can Corporation; Tradewinds Foods, Inc.; Inter–Americas Advertising Corp.; CPR International, Inc.; CPR International Limited; Condimentos de Puerto Rico, Inc.; Industrial Enterprises, Inc.; Joseph A. Unanue; Frank Unanue, Appellants,

v.

Ulpiano UNANUE–CASAL, a/k/a Charles Unanue, Debtor, and Gerardo Quiros–Lopez, Chapter 7 Trustee, Respondents.

Civ. No. 92–2909(GG).

United States District Court, D. Puerto Rico.

Dec. 15, 1993.

Gerardo A. Quiros, Trustee, Santurce, PR.

Alejandro Oliveras, Asst. U.S. Trustee, Hato Rey, PR.

Arturo J. Garcia–Sola, McConnell Valdes, San Juan, PR.

Jan Alan Brody, Carella, Byrne, Bain, Galfillan Cechi & Stewart, Roseland, NJ.

Harvey B. Nachman, Nachman, Santiago, Bray, Guillemard & Carrion, Santurce, PR.

William M. Vidal–Carvajal Hernandez & Vidal, San Juan, PR.

**218**

Michael R. Griffinger, Alison Stewart Kerber, Crummy, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ.

Ira B. Matetsky, Skadden, Arps, Slate, Meagher & Flom, New York City.

*Every happy family is alike, but every unhappy family is unhappy in its own way.*

Tolstoy, Anna Karenina

## OPINION AND ORDER

GIERBOLINI, Chief Judge.

Before this court is yet another chapter in the epic struggle of the alleged [1] debtor to escape the consequences of his prior actions and decisions. In a related action involving the same parties, *In re Unanue–Casal,* 159 B.R. 90 (D.P.R.1993), we decided in favor of the appellants above. We do so again, because we remain convinced that debtor's bankruptcy action is a ruse designed to frustrate the legitimate rights of his adversaries.

The instant matter involves a similar appeal from the bankruptcy court. We come to essentially the same conclusion that we reached in the earlier matter: that debtor's attempts to circumvent the action already pending in New Jersey must not succeed. Since the bankruptcy court's holdings were clearly erroneous we reverse the order of non-abstention [2] so that the validity of the contracts attacked in debtor's counterclaim may be sent to New Jersey where it belongs for a resolution that will hopefully assist in terminating the Puerto Rican proceedings in this case. In order to understand what has happened so far, a brief synopsis of our previous decision is helpful: [3]

Charles Unanue (Debtor or Charles) filed a bankruptcy petition under Chapter 7 on August 29, 1990 in this District, after litigating for almost three years in the New Jersey Superior Court. The bankruptcy filing automatically stayed the New Jersey action. The bankruptcy court denied Appellants relief from this stay on May 15, 1992, finding that they had not presented sufficient evidence of "cause" to warrant lifting the stay. On August 3, 1993, we held that the bankruptcy court erred when it found that the Appellant had not presented evidence of "cause", and in doing so abused its discretion in denying relief from the stay. We then reversed the bankruptcy court's order and granted appellants relief from the stay.

These proceedings have sprouted from a long and bitter dispute between the sons of Prudencio Unanue, (Prudencio) the founder of Goya, a manufacturer of foods directed predominantly at the Latino market. Don Prudencio and his wife, doña Carolina, were married in Puerto Rico on November 4, 1921; Prudencio was domiciled in New York and doña Carolina was domiciled in San Lorenzo, Puerto Rico. They had four sons: Charles, the debtor in the instant action, Joseph, Anthony (deceased) and Frank Unanue. Soon after their marriage, Prudencio returned to New York where doña Carolina joined him in 1923. By 1929, the Unanue's had moved to New Jersey where they would live and work until 1970.

On November 16, 1970, Prudencio executed his last will and testament and a revocable *inter vivos* trust in New York. He died in 1976, and after his death, the Trustees (Joseph and Frank Unanue) probated, administered and distributed his will. In 1986, the Superior Court in New Jersey approved a First Accounting filed by the trustees, and

1. Even though it appears more likely than not that the bankruptcy action is a sham, we shall for the sake of brevity refer to appellee as debtor, and not as alleged debtor, for the remainder of this OPINION.

2. The decision of a bankruptcy court not to abstain from deciding a matter before it under 28 U.S.C. § 1334(c) is appealable as of right immediately to a district court. See, e.g., *In re Holtzclaw,* 131 B.R. 162, 163 (E.D.Cal.1991). Appellee apparently does not disagree. Whether or not the bankruptcy court's decision not to abstain is decided under either the doctrine of mandatory or discretionary abstention is irrele-

vant. *In re Mec Steel Bldgs., Inc.,* 136 B.R. 606, 610 (D.P.R.1992) ("a motion for abstention is a contested matter upon which the bankruptcy court has the authority to enter a final order subject to appeal"). "A bankruptcy order need not dispose of all aspects of a case to be final; an order which disposes of a 'discrete dispute within the larger case' will be considered final and appealable." *In re Unanue–Casal,* 144 B.R. 604, 608 (D.P.R.1992).

3. For the full tale readers are referred to *In re Unanue–Casal,* 159 B.R. 90 (D.P.R.1993).

contested by C. Jeffrey Unanue, one of Charles' sons. At that time, several of the Beneficiaries received their share of the trust, in accordance with the trust's provisions. *See Unanue Casal v. Unanue Casal,* 132 F.R.D. 146, 148 (D.N.J.1989), aff'd 898 F.2d 839 (1st Cir.1990).

In 1969, prior to Prudencio's death in 1976, a dispute arose between Charles and his brothers, appellants in the prior action as well as the instant lawsuit. Prudencio subsequently allied himself with his other sons against Charles.

After this time, Charles has claimed that he has been an innocent victim of his brothers' plottings. This intra-family squabble was temporarily settled on June 9, 1972, with the execution of a settlement, the 1972 Agreement, between the parties. Under this agreement Charles' voting shares in Goya and the other affiliated companies were purchased for $4.5 million. Alas, this peace proved too fragile to last.

In 1973, in what has proved to be a harbinger of the acrimony that now engulfs the parties, Charles alleged that the other signatories to the 1972 Agreement had breached its provisions. To resolve this conflict the 1974 Amendment to the 1972 Agreement was signed on July 31, 1974. As part of the 1974 Amendment, Charles was excluded from sharing in Prudencio's estate, and removed from the family enterprises; in return, Charles received an accelerated payment of $4,300,000. To secure finality, Charles promised never to bring any claim or suit contesting or objecting to Don Prudencio's will or trust, and not to interfere with the disposition of assets of stock by Prudencio, his estate, the beneficiaries or his brothers. The Amendment also specified that any signatory who lost a suit "concerning any matter" with another signatory must recompense the prevailing party liquidated damages of double costs and attorney's fees.

Notwithstanding his prior agreement to the contrary, eleven years after his father's death, in July 1987, Charles decided to challenge his exclusion from his father's estate. On August 13, 1987, Joseph and Frank, as trustees of the 1970 trust, sued Charles, in the Superior Court of New Jersey. They were seeking a declaratory judgment barring Charles from maintaining any claims against Don Prudencio's estate and the *inter vivos* trust. Charles responded by filing in New Jersey an amended counterclaim on June 17, 1988, claiming that both the 1972 Agreement and the 1974 Amendment were invalid. He also claimed a share of the trust corpus.

On August 30, 1988, Charles filed a claim in the Superior Court of Puerto Rico requesting that the 1972 Agreement and the 1974 Amendment be rescinded. This claim was consolidated with a previous 1987 action in the Superior Court of Puerto Rico seeking an inheritance from Don Prudencio's, Doña Carolina's and Ana María's estate. Finally, Charles filed a bankruptcy petition under Chapter 7 on August 29, 1990, in the District of Puerto Rico—nine days before the close of the trial in New Jersey. The New Jersey proceedings were stayed contemporaneously with the filing of this Bankruptcy petition.

Judge Kole of the New Jersey Superior Court decided on December 4, 1991, *after 171 days of trial,* that Don Prudencio was domiciled in New Jersey on the dates in controversy. Appellants filed a second motion for further relief from the stay of the New Jersey proceeding. The bankruptcy court in its May 15, 1992, Opinion again denied relief from the stay, this time because it found the appellant failed to present evidence of "cause" to do so. We heard the arguments on appeal, and after reviewing the evidence and the law, we lifted the stay.

**CURRENT PROCEEDINGS**

In this action, the appellants contest the bankruptcy court's November 20, 1992 decision refusing to abstain from determining certain issues, namely the validity of the 1972 Agreement and the 1974 Amendment thereto that form part of Charles' counterclaim in the New Jersey action as well as his counterclaim in the bankruptcy action. Appellants are eleven companies, among them Goya Foods, Inc., and Goya de Puerto Rico, Inc., and individuals, notably Joseph and Frank Unanue.

As the New Jersey action commenced, the New Jersey court took exclusive jurisdiction over the estate of Don Prudencio and the

Trust. At the close of the litigation, Charles filed for bankruptcy in this district on August 29, 1990, for the clear purposes of seeking what he perceived to be a friendlier jurisdiction.

Charles' bankruptcy schedule claimed that while he possessed assets of merely nominal worth, he had liabilities of over one million dollars. (Item 3) [4]. It also omitted contingent and disputed claims. Appellants (and this court) find this somewhat incredible, given the assets transferred to Charles over the years of the family dispute and the peculiarity of some of Charles' financial transactions, which appear designed to hide his assets.

In the bankruptcy cases two adversary proceedings were filed against debtor. The first proceeding was designed to deny Charles a discharge of his debts on the ground that he engaged in various forms of misconduct that would bar discharge under 11 U.S.C. § 727, e.g. concealing assets, failing to provide essential financial information, etc. In his response to the complaint objecting to the Chapter 7 discharge, debtor consented to waive his discharge on the ground that he had no need for it. (Item 51).

The second adversary proceeding relates to appellants' belief that Charles is hiding substantial assets in the name of his current wife and two dummy corporations. The Chapter 7 Trustee authorized appellants' pursuit of an adversary proceeding on his behalf to set aside allegedly fraudulent transfers and to seek turnover of this property to the bankruptcy estate. (Item 49).

Debtor filed an amended counterclaim in March of 1992, alleging, inter alia, that the 1972 Agreement and the 1972 Settlement should be invalidated and deemed unenforceable and that the counterclaim defendants should be liable in the amount of millions upon millions of dollars. In response, the Goya companies moved the bankruptcy court to abstain from deciding the counterclaim under 28 U.S.C. §§ 1334(c)(1) and (2) to allow the issue to be decided in New Jersey where it has been the subject of a long and protracted litigation. (Item 57).

On November 20, 1992, the bankruptcy court severed the first count of debtor's counterclaim, in which it is asserted that the 1974 Amendment to the 1972 Agreement is void and held that the issue was a "core" proceeding within bankruptcy court jurisdiction and thus refused to abstain from addressing it. The instant appeal was filed on November 25, 1992.

We find that the bankruptcy court abused its discretion and that its November 20, 1992 decision was clearly erroneous. We REVERSE the November 20, 1992 Opinion and Order of the Bankruptcy Court, and ORDER the bankruptcy court to abstain from resolving the state law issues presented in Debtor's Amended Counterclaim, including but not limited to debtor's challenge to the proofs of claim based on his allegation that the 1974 Amendment to the 1972 Settlement Agreement between the parties was invalid, and permit the issue to be resolved in the pending New Jersey Superior Court action.

We find that given our prior ruling lifting the stay, that the issue of the validity of the 1972 Agreement and the 1974 Amendment is a matter best left to the New Jersey courts that have already familiarized themselves with the facts and issues. We find that the New Jersey action represents a prior pending state court action that is the appropriate forum in which the state law issues raised in the Amended Counterclaim should be resolved.

## I. Standard of Review

■ The standards of review that apply to decisions of the bankruptcy court are well-known. Under Fed. R. Bank. Bank. Proc. 8013, a bankruptcy court's factual findings are subject to reversal only if clearly erroneous, while legal conclusions are subject to *de novo* appeal. Findings of facts are reviewed under the clearly erroneous standard. "Ultimate facts", or mixed questions of fact and law, are also tested in the First Circuit under the "clearly erroneous" standard. *U.S. v. Cochrane,* 896 F.2d 635, 639 (1st Cir.), cert. den. 496 U.S. 929, 110 S.Ct. 2627, 110 L.Ed.2d 647 (1990).

4. Item numbers refer to documents submitted as part of the record on appeal.

## II. Abstention

### A. Mandatory Abstention

 Under 28 U.S.C. § 1334(c)(2), there are six criteria for the exercise of mandatory abstention: (1) the motion to abstain is timely; (2) the proceeding is based on a state law cause of action; (3) the proceeding is related to a case under Title 11 but does not arise under Title 11; (4) the action could not have been commenced in federal court absent jurisdiction under 28 U.S.C. § 1334; (5) the state court action has commenced; and (6) the state court action can be timely adjudicated. *See In re Nationwide Roofing and Sheet Metal, Inc.,* 130 B.R. 768, 778 (Bankr. S.D.Ohio 1991). We address this concerns seriatim.

No party contests the obvious fact that the first criterion is met. The second requirement is also satisfied, as the Amended Counterclaim is based on state law, i.e. the contract law of New Jersey. The third prerequisite is the crux upon which mandatory abstention swings, but in the final analysis it is present as well.

Indeed, this is the only relevant issue addressed by Appellee's briefs. Since Appellee has ignored every other contention and argument of Appellants, we deem them to be admitted. We would do so anyway, since we are firmly convinced of the accuracy of appellants' factual assertions and our reading of the law convinces us that they are in the right legally as well.

The validity of the 1974 Agreement is a contract law issue. It does not, under § 157(b)(2)(B), truly involve "matters concerning the administration of the estate" of a debtor. It involves litigation to which the alleged debtor is a party. These kind of state law contract claims have been found not to fall within the categories of core proceedings. *In re Castlerock Properties,* 781 F.2d 159, 161–62 (9th Cir.1986). The Amended Counterclaim involves an assertion not that the 1974 contract is somehow invalid under bankruptcy law, but that it is defective under contract principles.

██ "If an action would survive outside of bankruptcy, and in the absence of bankruptcy would have been initiated in a state or district court then it clearly involves a non-core matter." *In re Mec Steel Bldgs., Inc.,* 136 B.R. 606, 609 (D.P.R.1992) (citations omitted). "To merit classification as a core proceeding within the meaning of the statute, the nexus of the counterclaim itself 'must be a 'core' proceeding as that term is used in section 157(b)(1); that is to say, it must arise under or arise in a case under Title 11." In other words, a debtor's counterclaim "does not become 'core' simply because it is technically or arguably within a given (b)(2) description." *In re Candalero Sand & Gravel, Inc.,* 66 B.R. 903, 907 (D.P.R.1986) (citations omitted).

██ Charles claims that a claim filed against an estate is automatically "a core proceeding because it could arise only in the context of bankruptcy." (Appellee's Brief on Appeal, Docket Entry 8, at 25). This argument elevates form over substance. The mere fact that the Amended Counterclaim is raised in the form of a counterclaim against two parties that have filed contingent claims against the bankruptcy estate does not make it a core proceeding. This view would so enlarge bankruptcy jurisdiction as to convert every state action involving a bankruptcy debtor into a federal matter. *See Borintex Manufacturing v. Banco Gubernamental de Fomento,* 102 B.R. 8, 9 n. 1 (D.P.R.1989). Substance is more important than mere form. *Flores Rivera v. Telemundo Group,* 133 B.R. 674, 677 (D.P.R.1991).

█ The contract validity question is not core to the bankruptcy proceeding. Even where the action "will drastically affect both the debtor-creditor relationship and the assets of the state" it cannot be deemed a core proceeding if it arises prior to the bankruptcy filing and involves a right independent of and antecedent to the bankruptcy filing. *In re Candalero Sand & Gravel, Inc.,* 66 B.R. 903, 906 (D.P.R.1986).

If Charles wants to challenge the contract he himself signed to settle protracted litigation over two decades ago, he should do so in the New Jersey forum where these issues are before the court. Additionally, as debtor himself recognizes, the state law rights that form the core of the counterclaim "could be

enforced in a state court proceeding" and have absolutely no necessary connection to the bankruptcy court. (Docket Entry 8, 25–26). Abstention is thus the proper course. *See In re Richmond Tank Car Co.,* 119 B.R. 124, 127 (S.D.Tex.1989).

The final three requirements are obviously satisfied. The action could not have been commenced in federal court absent 28 U.S.C. § 1334. The New Jersey action has already commenced, and the case and the issue of the legal effects of the 1974 Amendment has been pending for some time, making this a proper case in which to abstain. *In re Mec Steel Bldgs., Inc.,* 136 B.R. at 610. Finally, there is no reason not to believe that the state issue could not be timely adjudicated, as long as Charles slows down or ceases his attempts to protract it. Since we have already lifted the automatic stay of the New Jersey action there is no reason for it not to go forward expeditiously. See *Acolyte Electric Corp. v. New York,* 69 B.R. 155, 180 (E.D.N.Y.1986). If Charles had not sued for bankruptcy in Puerto Rico, the New Jersey action might have concluded by now to resolve all remaining issues once Prudencio's domicile was decided to be New Jersey.

### B. Discretionary Abstention.

█ We now turn to the question of discretionary abstention, and find that even were mandatory discretion not as clearly warranted as we find it is, that it was an abuse of the bankruptcy court's discretion not to abstain under the doctrine of discretionary abstention. "Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for state law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11." 28 U.S.C. § 1334(c)(1).

█ In *Flores Rivera,* many of the factors underlying the doctrine of discretionary abstention were enumerated. Among those were (1) the effect on the efficient administration of the estate, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficulties or unsettled nature of the applicable law, (4) the presence

of a related proceeding in state court; (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334; (6) the relatedness of the proceeding to the main bankruptcy case; (7) the substance, and not the form, of the alleged core proceeding; (8) the feasibility of severing state law issues from bankruptcy matters; (9) the burden on the docket of the bankruptcy court; (10) the likelihood that commencement of bankruptcy proceeding amounted to forum shopping; (11) the existence of a right to jury trial; and (12) the presence in the proceeding of nondebtor parties. *Flores Rivera,* 133 B.R. at 677.

Under the above analysis we find that it was an abuse of discretion for the bankruptcy court to decline to abstain. This is a state law question, and abstention is warranted "on equitable grounds, and in the interest of justice and ... respect for local law." *In re Interamericas Turnkey Development Co., Inc.,* 94 B.R. 9, 13 (D.P.R.1988). While it is clear from our above discussion and from our previous decision that the factors warranting discretionary abstention are met, we find several factors especially prominent.

One major factor counselling discretionary abstention is the principle of judicial economy. We found previously that in order to preserve the scarce resources of the judiciary duplicative proceedings should be avoided and that the New Jersey court to proceed to determine the issues relating to Charles' counterclaims in that action.

Especially important is the New Jersey court's familiarity with the entire history of this festering family fiasco.

> The New Jersey court examined the family's history from the date Don Prudencio arrived in the United States to Don Prudencio's death in 1976. In addition the New Jersey Court is fully acquainted with the whole situation. It spent [171] days in trial, with [32] witnesses and [600] exhibits marked into evidence. Finally, it seems to us incontrovertible that a State court has more expertise and is more familiar with its own probate and contract laws than a Federal bankruptcy court.

*In re Unanue–Casal,* 159 B.R. at 98 (footnote omitted).

Another fundamental concern is the interrelatedness of the state law action with the bankruptcy action, or lack thereof. We again refer to our previous decision:

> We are persuaded by Appellants' argument that a resolution of the New Jersey proceedings would advance the settlement of the Bankruptcy case without interfering with it. If, for example, the decision came down in favor of the Debtor, he would then have available substantial funds with which to satisfy his creditors. If he were to lose in New Jersey then the Debtor would have a declaration against him under the 1974 Amendment for attorney's fees—no small sum—and a declaration that his inheritance claims were unconvincing. Both of these possible outcomes would promote the bankruptcy proceeding because they would determine if the Debtor would have additional funds or an additional debt. Neither of these proceedings would interfere with the estate because they are declaratory in nature and could not be acted upon without the proper proceedings in bankruptcy court.

. . . . .

> We are persuaded the Appellants have presented prima facie evidence that the resolution of this case in New Jersey would not interfere with the bankruptcy proceedings. On the other hand, the Debtor has failed to present any evidence to show that the administration of his estate would be affected.

*In re Unanue–Casal,* 159 B.R. at 99.

We also find that it is extremely likely that the filing of the bankruptcy action amounted to forum shopping with the intent of avoiding the consequences of a New Jersey decision that Charles felt would be adverse to his interests.

> The Debtor, Charles Unanue, filed his petition for bankruptcy on August 29, 1990; about one week before the last trial day, scheduled for September 7, 1990, before Judge Kole. The Appellants claim that the Debtor, who was present in New Jersey during the trial until September 7, neither objected to the proceedings nor did he inform the Appellants of his Bankruptcy petition. These circumstances closely resemble those cases that found the Debtor had filed bankruptcy in bad faith to avoid the effect of an impending decision. The bankruptcy court, however, found that the Debtor's motions for removal from the New Jersey Superior court were merely his efforts to have his case heard in Puerto Rico.[5]

> We can agree with the bankruptcy court that the Debtor was in a predicament, but we cannot agree it is the responsibility of the judicial system to accommodate him. Moreover, we cannot overlook the closeness to the end of trial in New Jersey that the debtor filed his bankruptcy petition; it has every appearance of being the sole result of the Debtor's or his attorney's perceptions that he was going to lose in New Jersey. We cannot turn our backs on this manipulation of the judicial system. There is also evidence that the Debtor's petition for bankruptcy is a sham, because he is not "financially distressed".

*In re Unanue–Casal,* 159 B.R. at 101–02.

## CONCLUSION

As a result of the analysis above, the court finds that the bankruptcy court's decision not to abstain was incorrect under either doctrine of abstention, mandatory or discretionary. Debtor's counterclaim should be remanded to the state court of New Jersey that has already begun to consider the facts relating to said counterclaim. Therefore, the bankruptcy court's decision not to abstain is hereby **REVERSED**. The stay is hereby lifted and the litigation pending in New Jersey will proceed. Judgment will be issued accordingly.

**SO ORDERED.**

---

5. The Appellants informed the bankruptcy court in their brief of the Debtor's many attempts to remove the case to Puerto Rico. The Debtor tried to remove both to a district court in New Jersey and to this district court in Puerto Rico. He was sanctioned by both District Courts under F.R.C.P. 11, and a $16,011.15 sanction was assessed against him. (R. on Appeal Vol. I, Ex. 33A at 10, n. 7) *See Unanue–Casal v. Unanue–Casal,* 898 F.2d 839 (1st Cir.1990); *See also Unanue Casal v. Unanue Casal,* 132 F.R.D. 146 (D.C.N.J.1989).